IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ABDUL LOVE,

        Plaintiff,

v.

        Case No. 3:22-CV-2340-NJR

LATOYA HUGHES and
RICHARD ARNOLD,

        Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Abdul Love, an inmate incarcerated at Pinckneyville Correctional Center within the Illinois Department of Corrections (IDOC), brings this action for deprivations of his constitutional and statutory rights to religious exercise. Love alleges that, through Pinckneyville's meal delivery practices during Ramadan in 2022, Defendants Richard Arnold and Latoya Hughes violated his rights under the First Amendment, U.S. CONST. amend. I, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5.

This matter is now before the Court on Defendants' summary judgment motion. (Doc. 82). They argue Arnold is entitled to summary judgment on Love's First Amendment claim because he is entitled to qualified immunity and because he was insufficiently personally involved to be liable. They argue Hughes is entitled to summary judgment on Love's RLUIPA claim because Pinckneyville's meal delivery practices did not substantially burden Love's religious practice and served a compelling government

interest. Additionally, they argue Love's claim for injunctive relief is moot. Love responded (Doc. 90), and Defendants filed a reply (Doc. 95). For the reasons set forth below, the Court grants summary judgment on the First Amendment claim against Arnold and denies summary judgment on the RLUIPA claim against Hughes.

### BACKGROUND[1]

Plaintiff Abdul Love has been incarcerated in Pinckneyville since approximately 2018. (Doc. 82-1, at 4). Love identifies as a practicing Muslim (Doc. 82-1, at 8), and participates in Islamic religious observances through the IDOC, including Ramadan. (Doc. 82-1, at 7-8). Ramadan is a month-long Islamic celebration in which worshipers fast between the hours of sunrise and sunset, during which time they abstain from food, drink, and sexual intercourse. (Doc. 82-1, at 9). Worshipers must break fast at sunset, before the evening prayer. *Id.* at 10. According to Love, the fast is broken (in ideal conditions) by eating dates and drinking water. (Doc. 82-1, at 10; Doc. 90, at 7). However, one may break fast using any food item other than certain forbidden items such as pork or alcohol. (Doc. 82-1, at 10).

In April 2022, Pinckneyville was under administrative quarantine due to COVID restrictions. (Doc. 82-2, at 2). As such, all Ramadan meals were brought to individuals' cells. *Id.* From his cell window, Love saw his dinner trays being delivered to the cellhouse at around 6:00 p.m., approximately 30 to 45 minutes before sunset. (Doc. 82-1, at 11). However, his tray would not be delivered to his cell until approximately 30 minutes to

---

[1] The following facts are not in dispute unless otherwise noted.

two hours after sunset. *Id.* This was due to the "dayroom" schedule; during the month of April, dayroom was from 6:25 p.m. to 7:25 p.m. and from 7:30 p.m. to 8:30 p.m. (Doc. 90, at 30). Meals would only be delivered after both dayroom periods had ended, when inmates were secured back in their cells. (Doc. 62, at 23). Because his dietary trays arrived after sunset, Love broke his fast at sunset using his own personal food, which he purchased from the commissary. (Doc. 82-1, at 12-13). He did this each day of Ramadan and was never prevented from breaking his fast entirely. (Doc. 82-1, at 13).

At all relevant times, Arnold was facility chaplain at Pinckneyville. (Doc. 82-2, at 1). As Chaplain, Arnold was required to coordinate with the prison administration to help facilitate the observance of Ramadan. *Id.* However, Arnold did not personally deliver Ramadan trays. (Doc. 82-1, at 12). Instead, trays were delivered and passed out by dietary supervisors and individuals in custody who served as porters. *Id.*

In April 2022, during an in-person religious service, Love spoke to Arnold face-to-face and told him that his trays were being delivered late. (Doc. 82-1, at 13). Arnold said he would "look into it" or "take care of it." *Id.* When the delays continued, Love submitted a grievance, requesting that his dinner trays be delivered on time. (Doc. 62, at 22-23). Arnold responded to his grievance, and a grievance officer investigated the incident. *Id.* Based on security footage, it was determined that trays were being delivered to cells between 8:30 and 9:00 p.m., once dayroom was complete. *Id.* This tray-delivery policy is no longer in practice; the plan for the upcoming Ramadan observation is for individuals to break their fast together in Dietary. (Doc. 82-5, at 1). Ramadan trays will no longer be

delivered to inmates' cells unless there is another lockdown or exigent security concern. *Id.* at 2.

After he filed his grievance and the delays nevertheless continued, Love came to believe that Arnold had done nothing to address his concerns. (Doc. 90, at 3; Doc. 95, at 2). Love alleges that Arnold's failure to act amounts to a violation of his free exercise rights under the First Amendment.

Love seeks monetary relief in his claim against Arnold, and declaratory and injunctive relief in his claim against Hughes. (Doc. 1, at 13-14). Specifically, he seeks monetary damages totaling $820,000, a declaration that his rights were violated, and an injunction requiring Defendants to create a plan for accommodating the religious practices of inmates during Ramadan. *Id.*

## LEGAL STANDARDS

Summary judgment is proper only if the moving party can demonstrate, through pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). "A genuine dispute over a material fact exists if 'the evidence is such that a reasonable jury could return a verdict' for the nonmovant." *Machicote v. Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material if it might affect the outcome of a suit under

the relevant substantive law. *Ruffin-Thompkins*, 422 F.3d at 607.

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012); *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014). But "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014).

The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160–61 (1970); *see also Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004). Once the moving party sets forth the basis for summary judgment, the burden shifts to the nonmoving party, who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp.*, 477 U.S. at 322–24.

## DISCUSSION

### A. Count I: Deprivation of First Amendment free exercise rights under 42 U.S.C. § 1983 by Defendant Arnold

Love claims Arnold violated his First Amendment free exercise right when he "[f]ail[ed] to provide Plaintiff[] with the necessary accommodations to worship during

the Islamic holy month of Ramadan." (Doc. 1, at 8). Love brings this claim under 42 U.S.C. § 1983, which permits plaintiffs to sue state officials who violate their rights under federal law or the United States Constitution. To state a claim under § 1983, Love must submit "evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." *Childs v. Webster*, 168 F.4th 1020, 1032 (7th Cir. 2026) (quoting *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019)). Thus, Arnold is entitled to summary judgment if the undisputed material facts, viewed in the light most favorable to Love, show that Love cannot establish all three of the following elements: (1) that Arnold was personally involved; (2) that Love's religious practices were substantially burdened; and (3) that the burden was unjustifiable.

While Defendants contest each of the three elements, this case can be decided solely on the first: Arnold's personal involvement. A defendant cannot be held liable under § 1983 unless he is shown to be "personally responsible for a deprivation of a constitutional right." *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). This requires that he "caused or participated in an alleged constitutional deprivation . . . . A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)). Vicarious liability does not exist under § 1983; Arnold's liability, if any, depends on his own "knowledge and actions, not on the knowledge or actions" of others. *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). Although the personal involvement requirement may be satisfied when a supervisor

knows about a subordinate's misconduct and "approve[s] it, condone[s] it, or turn[s] a blind eye," *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988), an officer is not liable for another's transgression merely because he is aware of it. *See Burks*, 555 F.3d at 595 ("Public officials do not have a free-floating obligation to put things to rights . . . . Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). This is especially true when the defendant's office does not grant him the power to correct the alleged issue: An officer "cannot be held liable for failing to do something he had no authority to do." *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023).

Defendants argue there is no evidence Arnold was personally responsible for depriving Love of timely access to dietary trays. (Doc. 82, at 7). They point to Love's admission that Arnold did not deliver his trays, which were instead passed out by dietary supervisors and individuals in custody. (Doc. 82-1, at 12; Doc. 82-2, at 2; Doc. 90, at 37). Love responds by arguing that Arnold should nonetheless be held accountable as he knew about the problem but "did absolutely nothing" to ensure the trays arrived on time. (Doc. 90, at 19). In support of his claims, Love points to evidence that Arnold knew the trays were being delivered late and that this delay would burden the practices of an observant Muslim. (Doc. 90, at 18, 20). Moreover, Love claims Arnold failed to tell the security staff the precise times at which to deliver Ramadan meals and that Arnold never informed the wardens that there was an "on-going issue with the Ramadan trays." (Doc. 90, at 19). Love argues that Arnold's knowledge plus his failure to act implies that

he willfully "turned a blind eye" to the problem, enough to establish his personal involvement under § 1983. (Doc. 90, at 16).

However, Arnold's alleged knowledge and omissions are insufficient to establish his involvement because Love has not produced evidence from which a jury could conclude that Arnold had responsibility or authority over the timing of tray deliveries. When a prison official lacks the authority to make the requested changes to an inmate's situation, his failure to do so cannot be the basis for "personal involvement" under § 1983. *See Mitchell v. Kallas*, 895 F.3d 492, 498–99 (7th Cir. 2018) (no personal involvement because defendant had no authority to order hormone therapy for plaintiff); *Hunter*, 73 F.4th at 566 (no personal involvement because defendant had no authority to reassign cellmates). Although Arnold coordinated a list of Ramadan participants and offered guidance regarding Ramadan accommodations (Doc. 82-2, at 1), all evidence on record indicates that tray delivery during Ramadan was managed by Dietary, not the Chaplain. (Doc. 82-1, at 11; Doc. 82-2, at 2; Doc. 90, at 37). Love has introduced no evidence that Arnold could have dictated the precise times at which trays were passed out to inmates, nor that he had the power to override the prison's quarantine policy of distributing trays after dayroom. While Love claims that Arnold failed to report his complaints about the timing of tray deliveries (Doc. 90, at 19), he has not shown how this failure could have caused the alleged injury, given that his complaints were nonetheless received and responded to in a timely manner by the relevant officers. (Doc. 62, at 23). Based on the

evidence in the record, no reasonable jury could conclude that Arnold was personally responsible for the untimely delivery of Love's Ramadan trays.

Because Love has not met his burden to establish Arnold's personal responsibility for an alleged deprivation of rights under § 1983, Arnold is entitled to summary judgment on Count I.

### B. Count II: Substantial burden on religious exercise under RLUIPA by Defendant Hughes

Love's second claim is against Defendant Latoya Hughes in her official capacity as Director of IDOC. Love alleges that Hughes violated RLUIPA through the late delivery of Love's trays. Religious exercise claims under RLUIPA are reviewed according to a burden-shifting framework. A plaintiff bears the initial burden to introduce evidence (1) that he sought to engage in a sincere religious exercise, and (2) that exercise was substantially burdened by a prison practice. *Holt v. Hobbs*, 574 U.S. 352, 361 (2015). If the plaintiff satisfies this obligation, the burden shifts to the defendant to show that (1) the practice fulfilled a compelling government interest and (2) used the least restrictive means to do so. *West v. Radtke*, 48 F.4th 836, 844 (7th Cir. 2022).

The parties do not dispute that Love sought to engage in a sincere religious exercise by breaking fast at sunset. (Doc. 82, at 2). Love argues that his religious exercise was substantially burdened by the late delivery of dietary trays; because the trays were late, he had to break his fast using his own personal food, purchased with his own money. (Doc. 90, at 24). Defendants contend that this did not impose a substantial burden because Love was nonetheless able to break his fast in an appropriate manner. (Doc. 82, at 11).

Moreover, Defendants argue that the meal schedule fulfilled a compelling government interest in maintaining safety and security during quarantine. (Doc. 82, at 10).

### a. Substantial Burden

Defendants argue that the timing of the Ramadan tray delivery did not place a substantial burden on Love's religious exercise because Love was able to break his fast in an appropriate manner using food purchased from the commissary. (Doc. 82, at 11). Under RLUIPA, a "substantial burden" occurs "when the government 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Korte v. Sebelius*, 735 F.3d 654, 682 (7th Cir. 2013), quoting *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715 (1981). In the context of penal facilities, this can occur in two types of cases: first, when the prison entirely prohibits a religiously motivated practice; and second, when the prison attaches some hardship or penalty to the practice, "'forcing' the inmate 'to choose between violating his religion,' on the one hand, 'and incurring [some] negative consequence,' on the other." *Childs*, 168 F.4th at 1028, *quoting West*, 48 F.4th at 845. For instance, if a prison denies access to religiously appropriate meals, it may "substantially burden" a prisoner's exercise by "forc[ing] him to choose between his religious practice and adequate nutrition." *Nelson v. Miller*, 570 F.3d 868, 879 (7th Cir. 2009). Alternatively, where the prison allows access to appropriate meals but requires the prisoner to purchase them himself, it still imposes a substantial burden if "the cost . . . of subsidizing his own religiously compelled diet would systematically outpace his reliable income." *Jones v. Carter*, 915 F.3d 1147, 1151 (7th Cir. 2019).

Defendants argue that, because Love successfully broke his fast each day of Ramadan using his own food, he was never actually forced to "choose between adequate nutrition and his religious beliefs" and thus did not experience "substantial pressure" to violate those beliefs. (Doc. 82, at 11). However, a prisoner who receives adequate nutrition may still experience a substantial burden: the cost he must pay out of pocket to finance his religious practice. *Childs*, 168 F.4th at 1027. Whether a financial burden rises to the level of "substantial" is a "line-drawing issue[]," dependent on facts such as the plaintiff's reliable income and the cost of his purchases. *Id.* at 1028. *Compare Carter*, 915 F.3d 1147 (substantial burden when inmate would need to regularly purchase halal meat at cost that exceeded his salary), *with Childs*, 168 F.4th 1020 (no substantial burden when inmate would need to make one-time purchase of prayer schedule at "de minimis" cost).

Love has testified, and it is undisputed, that he used his own personal food to break his fast each day of Ramadan, and that he purchased this food from the commissary. (Doc. 82-1, at 12). While neither party has introduced evidence regarding Love's finances, the law does not "require a showing of indigency or other hardship to satisfy the substantial burden test." *Carter*, 915 F.3d at 1151. From the evidence in the record, viewed in the light most favorable to Love, the trier of fact could conclude that Love was forced to choose between violating his religion and experiencing the "negative consequence" of having to make burdensome purchases each day of the month. *West*, 48 F.4th at 845. Whether this burden was truly substantial is a disputed factual question that cannot be resolved on summary judgment.

*b. Compelling Governmental Interest*

Next, Defendants argue that the timing of the tray deliveries did not violate RLUIPA because it was in furtherance of a compelling governmental interest: maintaining safety and security during quarantine. (Doc. 82, at 10). However, Defendants fail to address whether this was the *least restrictive means* of furthering that interest, which is an essential requirement to survive RLUIPA's strict-scrutiny standard. *See Holt*, 574 U.S. at 365 ("[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it."). Defendants have the burdens of production and persuasion as to the "least restrictive means" defense. *Schlemm v. Wall*, 784 F.3d 362, 365 (7th Cir. 2015). Here, Defendants have failed to produce evidence, or even to argue, that other methods of tray distribution would have been ineffective—such as distributing trays between dayroom sessions, a solution that Love proposes in his response. (Doc. 90, at 21). Because Defendants have not upheld their burdens of production or persuasion, they are not entitled to summary judgment on Count II.

## C. Injunctive relief

Finally, Defendants argue that Love is not entitled to injunctive relief because current prison policy renders an injunction unnecessary. (Doc. 82, at 11). Although they do not explicitly invoke the concept, their argument appears to be that Pinckneyville's change in tray distribution practice has mooted Love's claim for injunctive relief. This is incorrect. Because the prison has left themselves the option to re-start the challenged practice, Love's claim is not moot.

"A court's power to grant injunctive relief only survives if such relief is actually needed." *Nelson*, 570 F.3d at 882–83, *abrogated on other grounds by*, *Carter*, 915 F.3d 1147, *as recognized in*, *Bey v. Haines*, 802 F. App'x 194, 200 (7th Cir. 2020). The mere existence of a past violation is not enough; an injunction is only appropriate if "there exists some cognizable danger of recurrent violation, something more than the mere possibility." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). However, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). If it were otherwise, the defendant could simply re-start the challenged behavior as soon as the case was dismissed. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). In the event of "voluntary cessation," the case is only mooted if "it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur." *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979) (quoting *W. T. Grant Co.*, 345 U.S. at 633). The defendant bears the "formidable burden" of making it "absolutely clear" that this is true. *Friends of the Earth, Inc.*, 528 U.S. at 190. A mere statement by the government that it will not resume the conduct generally does not moot a case, particularly if the government fails to preclude the possibility that it will resume the conduct if similar circumstances reoccur. *See Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 240 (2024) (promise that plaintiff "will not be placed on the No Fly List in the future based on the currently available information" did not moot the controversy).

Here, Defendants argue that an injunction is unnecessary because current prison policy is for Ramadan participants to break fast in a group meal at sunset. (Doc. 82, at 11). However, if the facility goes on lockdown again, or if there is "a security need," the prison acknowledges that it may reinstitute the policy of delivering Ramadan meals to prisoners' cells. (Doc. 82, at 5). This falls squarely within the heartland of the voluntary cessation exception: Defendants not only fail to demonstrate that the challenged conduct cannot reoccur but affirmatively admit that it could. Love, therefore, can still seek an injunction.

## CONCLUSION

For these reasons, the Court **GRANTS in part** and **DENIES in part** the motion for summary judgment filed by Defendants Latoya Hughes and Richard Arnold. (Doc. 82). Plaintiff Abdul Love's First Amendment claim against Arnold (Count I) is **DISMISSED with prejudice**. At the close of the case, the Clerk of Court shall enter judgment in favor of Defendant Richard Arnold and against Plaintiff Abdul Love on Count I. Love's RLUIPA claim against Hughes (Count II) remains pending.

The Court will set a status conference by separate order for the purpose of selecting a firm date for a bench trial.

**IT IS SO ORDERED.**

**DATED:  July 27, 2026**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**